**ORDERED.**

**Dated:  October 03, 2025**

Tiffany P. Geyer
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

IVF Orlando, Inc.,                                    Case No. 6:24-bk-05475-TPG
                                                      Chapter 11
                            Debtor.                   Subchapter V

_____/

### MEMORANDUM OPINION ON
### OBJECTIONS TO CONFIRMATION

THIS CASE came on for hearing on June 5, 2025, to consider confirmation of the

Debtor's Chapter 11 Subchapter V plan (Doc. No. 54) as modified (Doc. No. 100) (collectively,

the "Plan"). (Doc. No. 132.) Objections to the Plan were filed by Fox Funding Group, LLC

("Fox") (Doc. No. 73) and Overton Funding, LLC ("Overton") (Doc. No. 74) (Fox and Overton

collectively, the "Funders")[1] pertaining to prepetition merchant cash advance agreements

("MCAs") with the Debtor. The Funders argue the Debtor did not propose the Plan in good faith

as § 1129(a)(3)[2] requires because the Plan relies on the use of future receivables the Funders

_____

[1] The Funders operate within the same zip code in Hollywood, Florida, but at different addresses. (Claim 7-1 Part 2 at 1; Claim 8-1 Part 2 at 3.)

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

claim they purchased and own under the MCAs.[3] As such, the Funders argue that the Debtor lacks any legal or equitable interest in the receivables and that their ownership interests cannot be restructured. Alternatively, the Funders argue their claims are secured and must be paid in full pursuant to § 1129(b)(2)(A)(i)(II) and § 1191(c)(1). Because the Plan treats their claims as unsecured and fails to account for a potential determination by this Court that the Funders own the future receivables, as raised in pending adversary proceedings (Adv. Pro. No. 6:25-ap-00027 and Adv. Pro. No. 6:25-ap-00028), the Funders argue good faith is absent.

On July 8, 2025, the Court held a hearing and advised the parties it would confirm the Plan on a nonconsensual basis pursuant to § 1191(b) and overrule the Funders' objections. (Doc. No. 143.) The Court entered an order confirming the Plan on September 23, 2025 (Doc. No. 158) and issues this Memorandum Opinion setting forth and supplementing the Court's oral ruling. If there are any contradictions between the oral ruling and the Memorandum Opinion, the Memorandum Opinion controls.

## I.    FACTS AND PROCEDURAL HISTORY

A review of the Debtor's background and the proceedings leading up to confirmation is in order. The Court begins with the Debtor's operations and reasons for filing bankruptcy, then discusses the activity in this case before confirmation, and finally the preparations and proceedings regarding confirmation.

### A.  The Debtor's operations and reasons for filing this case.

The Debtor offers fertility testing and performs in vitro fertilization services in a laboratory located in its leased premises in which embryo and donor inventory is preserved in liquid nitrogen. (Doc. No. 36 ¶¶ 2, 4.) The Debtor's revenues are generated mainly from private

---

[3] In their objections, the Funders raise the issue of good faith under § 1129(a)(2) but this requirement is found in § 1129(a)(3).

insurance companies and patients who pay for the services personally. (*Id.* ¶ 4.) "The main catalyst for filing Chapter 11 was the need to address a series of short-term small business loans which were approaching default status." (*Id.* ¶ 5.) The Debtor executed the MCAs with the Funders just a few weeks prior to filing this case and just a few days apart. (Doc. No. 1; Claim 7-1 Part 2 at 1; Claim 8-1 Part 2 at 3.)

###    B. Pre-confirmation case activity.

The Debtor filed this Subchapter V case on October 8, 2024, and included the Funders on the creditor matrix. (Doc. No. 1.) The Funders timely filed proofs of claims executed by the same individual and attached UCC-1 filings specifying the same collateral.[4] (Claim 7-1 at 2, 3; Claim

---

[4] Overton's UCC-1 described its collateral as follows:

> Secured Party has purchased an interest in accounts and proceeds from Debtor, described as "Receipts" in the agreement between Debtor and Secured Party, and as a result, Secured Party has a security interest in such Receipts. "Receipts" means all accounts receivable and payment rights arising out of or relating to for Merchant's sale or delivery of goods and/or services due to Debtor after the date of the agreement, whether paid directly by Merchant's customers or paid by others on Merchant's customers' behalves or as reimbursements. Debtor and Secured Party intend that the sale of Receipts is a sale and not an assignment for security. Secured Party has been granted a security interest in: all accounts and proceeds.

(Claim 7-1 Part 3 at 2.) Fox's UCC-1 described its collateral as follows:

> SECURED PARTY HAS PURCHASED AN INTEREST IN ACCOUNTS AND PROCEEDS FROM DEBTOR, DESCRIBED AS "RECEIPTS" IN THE AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, AND AS A RESULT, SECURED PARTY HAS A SECURITY INTEREST IN SUCH RECEIPTS. "RECEIPTS" MEANS ALL ACCOUNTS RECEIVABLE AND PAYMENT RIGHTS ARISING OUT OF OR RELATING TO FOR MERCHANT'S SALE OR DELIVERY OF GOODS AND/OR SERVICES DUE TO DEBTOR AFTER THE DATE OF THE AGREEMENT, WHETHER PAID DIRECTLY BY MERCHANT'S CUSTOMERS OR PAID BY OTHERS ON MERCHANT'S CUSTOMERS' BEHALVES OR AS REIMBURSEMENTS. DEBTOR AND SECURED PARTY INTEND THAT THE SALE OF RECEIPTS IS A SALE AND NOT AN ASSIGNMENT FOR SECURITY. SECURED PARTY HAS BEEN GRANTED A SECURITY INTEREST IN: ALL ACCOUNTS AND PROCEEDS.

(Claim 8-1 Part 3 at 1.)

8-1 at 2, 3.) Overton asserted a $158,858 secured claim (Claim 7-1 at 2), and Fox asserted a

$89,223.35 secured claim (Claim 8-1 at 2). Overton listed the basis of its claim as an

"[a]greement for the sale of future receivables" (Claim 7-1 at 2), and Fox similarly listed the

basis of its claim as an "[a]greement for the sale of future receipts."[5] (Claim 8-1 at 2).

Soon after the case was filed, the Debtor filed its emergency motion to use cash

collateral. (Doc. No. 17.) The Debtor's schedules reflect $125,035.33 in cash and cash

equivalents spread through nine accounts on the petition date, furniture and fixtures valued at

$8,000, and machinery, equipment and vehicles worth $41,854. (Doc. No. 38 at 9.) In the cash

collateral motion and throughout the case, the Debtor acknowledged a senior secured claim held

---

[5] In *Revenue Based Finance in Bankruptcy and Beyond*, the author observes that "[w]hile receivables are rights to payment for goods sold or services rendered, receipts could be intended to sweep more broadly to encompass anything deposited into a borrower's bank account. Further, even if the transaction is characterized as a sale, the repayment comes from any funds in the deposit account, not necessarily those tied to revenue from goods sold or services rendered." Kara J. Bruce, *Revenue-Based Finance in Bankruptcy and Beyond*, 45 No. 4 Bankruptcy Law Letter NL 1 n.16 (Apr. 2025); *see also Butler Trucking LLC v. CashFloit, LLC (In re Butler Trucking, LLC)*, Ch. 11 Case No.: 24-32443, Adv. No. 25-03004, 2025 WL 1934205, at *1 n.3 (Bankr. N.D. Ohio July 14, 2025) (observing "that the terminology used in [MCAs] has evolved from purchases of 'future receivables' to purchases of 'future receipts'"); *compare GMI Group, Inc. v. Unique Funding Sols., LLC (In re GMI Group, Inc.)*, 606 B.R. 467 (Bankr. N.D. Ga. 2019) ("future receivables") and *Cap Call, LLC v. Foster (In re Shoot The Moon, LLC)*, 635 B.R. 797 (Bankr. D. Mont. 2021) ("future receivables") *with In re McKenzie Contracting, LLC*, No. 8:24-bk-01255-RCT, 2024 WL 3508375 (Bankr. M.D. Fla. July 19, 2024) ("future receipts") and *O'Toole v. Radium2 Cap., LLC (In re J.P.R. Mechanical Inc.)*, Ch. 7 Case No. 19-23480 (DSJ), Adv. No. 21-07079 (DSJ), Adv. No. 21-07082 (DSJ), 2025 WL 1550541 (Bankr. S.D.N.Y. May 30, 2025) ("future receipts")). Here, the Court considers the terms "future receivables" and "future receipts" interchangeable as used by the Funders. Both Funders' UCC-1 filings contained the same collateral description despite their use of different terms in their proofs of claims, and the Funders' MCAs employ both terms. (*E.g.* Claim 7-1 Part 2 § 1 ("Sale of Future Receipts"), Part 2 § 14 ("Sale of Future Receivables"); Claim 8-1 Part 2 at 1 (titling agreement as "FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT"); Part 2 at 5, §1.9 ("Sale of Receipts")).

by FNB Community Bank ("<u>FNB</u>") with a blanket lien[6] perfected by a UCC-1 filing on

September 9, 2022, several years prior to the UCC-1 filings by Overton[7] and Fox.[8] (Doc. No. 17

¶ 7.)[9] The senior lien is reflected in Claim 4 in the amount of $522,947.51.[10]

The Court entered multiple orders approving the Debtor's use of cash collateral on an

interim basis. (Doc. Nos. 31, 42, 52, 96, 111.) Each interim order contained standard language

preserving the status quo, granting replacement liens to the same extent, priority, and validity as

existed prepetition and preserving the ability of a party in interest to request modified adequate

protection or restrictions on the use of cash collateral, or any other right or remedy which may be

available. (*See e.g.*, Doc. No. 111 ¶¶ 4, 6.) There were no objections to the Debtor's use of cash

collateral by any party. In fact, other than filing proofs of claims and entering appearances, there

was no docket activity by the Funders during the first several months of the Debtor's case.

Because the Debtor filed its case as a Chapter 11 Subchapter V case, the Debtor had

ninety days to file a plan — until January 6, 2025, which it timely filed on that date. (Doc. No.

54.) Six weeks later, on February 18, 2025, the Funders commenced adversary proceedings

---

[6] FNB's UCC-1 described its collateral as follows:

> Debtor grants to Creditor a security interest in all of the right, title and interest of Debtor in and to all business assets including, but not limited to Accounts Receivables, Inventory, Instruments, Equipment, Intangibles, Accounts, Chattels, Paper, Good Will, Specific Property and All Property of Debtor and all proceeds thereof (collectively, the "Collateral"). This security interest is granted to Creditor by Debtor to secure performance and payment of all obligations and indebtedness of Debtor to Creditor hereunder and as set forth herein.

(Claim 4-1 Part 2 at 10.)

[7] Overton, through CT Corporation System as representative, filed UCC-1 Financing Statement 202402551001 on September 25, 2024. (Claim 7-1 Part 3.)

[8] Fox, through CT Corporation System as representative, filed UCC-1 Financing Statement 20240253073X on September 24, 2024. (Claim 8-1 Part 3.)

[9] The Debtor attached as Exhibit C to the cash collateral motion a chart listing five UCC-1 filing numbers, including those of FNB, Fox, and Overton. (Doc. No. 17 at 11.)

[10] Banker's Healthcare Group filed Claim 4 attaching UCC-1 Financing Statement 202202935620 filed on September 9, 2022. (Claim 4-1.) The UCC-1 Financing Statement was amended on October 3, 2022, to reflect FNB's interest. (*Id.* Part 2 at 11.)

against the Debtor. (Adv. Pro. No. 6:25-ap-00027 (Overton); Adv. Pro. No. 6:25-ap-00028 (Fox).) The complaints are substantively identical. Each asserts six counts: Count I — a determination of whether the receivables contemplated by the Funders' agreements with the Debtor are property of the Debtor's estate; Count II — a declaration that the Debtor must turnover any uncollected receivables that are not deemed property of the estate; Count III — breach of fiduciary duty; Count IV — conversion; Count V — exception from discharge pursuant to § 523(a)(2)(A); and Count VI — exception from discharge pursuant to § 523(a)(2)(B). (Adv. Pro. No. 6:25-ap-00027, Doc. No. 1; Adv. Pro. No. 6:25-ap-00028, Doc. No. 1.) Neither complaint was accompanied by a request for a temporary restraining order seeking to prevent the Debtor from using the future receivables the Funders claim to own. The Debtor filed answers, affirmative defenses, and counterclaims[11] in each adversary proceeding (Adv. Pro. No. 6:25-ap-00027, Doc. No. 11; Adv. Pro. No. 6:25-ap-00028, Doc. No. 11), and the Funders filed motions to dismiss the counterclaims (Adv. Pro. No. 6:25-ap-00027, Doc. No. 16; Adv. Pro. No. 6:25-ap-00028, Doc. No. 16).

### C. Confirmation preparations and proceedings.

On March 24, 2025, the Debtor filed motions to determine the secured status of the

---

[11] In its counterclaims in the adversary proceedings, the Debtor alleges the MCAs result in annual interest rates of 77.8% for the Fox transaction (Adv. Pro. No. 6:25-ap-00028-TPG, Doc. No 10 ¶ 22) and 51.8% for the Overton transaction (Adv. Pro. No. 6:25-ap-00027-TPG, Doc. No. 11 ¶ 22). The interest rates are calculated using the principal amounts as the amounts received by the Debtor from the Funders, the total costs of the loans as the amounts of the purchased receivables, and the terms as the number of weeks it would take the Debtor to pay the equivalent of the purchased receivables.

Funders' claims pursuant to § 506(a) (the "Motions to Value").[12] (Doc. Nos. 97, 98.) The Debtor argued that the sum of its property as reflected in Schedule A/B, including its receivables and cash, was fully encumbered by FNB's $522,947.51 preexisting lien as reflected in Claim 4. (Doc. No. 97 ¶ 2; Doc. No. 98 ¶ 2.) Consistent with their positions in the adversary proceedings, the Funders filed responses arguing that the MCAs resulted in a sale of the Debtor's future receivables and not a loan or debt subject to reorganization. (Doc. Nos. 108, 109.) The Funders also argue that because their adversary complaints are still pending and raise a dispute concerning the property interests in the Debtor's future receivables, it would be "premature for the Court to make a determination as to lien priority and value" under § 506(a). (Doc. No. 108 ¶ 2; Doc. No. 109 ¶ 2.)

The Debtor and the Funders subsequently reached agreements (Doc. No. 119) on the Motions to Value and submitted orders providing that, if the MCAs resulted in secured transactions and not ownership interests, the Funders' secured claims were wholly unsecured due to FNB's senior secured lien. (Doc. Nos. 122, 128.) Although the orders preserved the Funders' claims in the adversary proceedings (Doc. No. 122 ¶ 3; Doc. No. 128 ¶ 3), the orders are conclusive on the issue of the value of the Funders' claims under the Plan if the MCAs reflect a secured transaction.

---

[12] In relevant part, § 506(a) states the following:

> (1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The Debtor placed the Funders' claims in Class 3 (Overton) and Class 4 (Fox) in the initial plan. (Doc. No. 54 at 12.) Consistent with the orders granting the Motions to Value (Doc. Nos. 122, 128), both claims are treated as wholly unsecured in Class 8 with the Debtor's other unsecured claims (Doc. No. 54 at 15).

On February 12, 2025, the Funders objected to confirmation (Doc. Nos. 73, 74) arguing the Plan should not be confirmed because it fails to provide for a potential determination by this Court that the MCAs reflect a true sale, as sought in Count I of their adversary complaints. Citing U.C.C. § 9-318(a),[13] the Funders argue that when a debtor sells an account, chattel paper, payment intangible, or promissory note, the Debtor does not retain a legal or equitable interest in the collateral sold. (Doc. No. 73 ¶¶ 4, 5; Doc. No. 74 ¶¶ 4, 5.) Accordingly, they argue the Debtor's future receivables are not property of the Debtor's estate and that the Debtor's Plan proposing to use them as such violates the good faith requirement in § 1129(a)(3).[14] (Doc. No. 73 ¶ 5; Doc. No. 74 ¶ 5.) Relatedly, the Funders argue a sale transaction is not a type of debt the Debtor can reorganize. Alternatively, the Funders argue their claims are secured and must be paid in full pursuant to § 1129(b)(2)(A)(i)(II) and § 1191(c)(1), and that the Plan improperly

---

[13] Section 9-318 of the Uniform Commercial Code states the following:

> (a) [Seller retains no interest.] A debtor that has sold an account, chattel paper, payment intangible, or promissory note does not retain a legal or equitable interest in the collateral sold.

[14] The Funders did not vote on the Plan, but Class 8, the unsecured class, had two accepting votes. (Doc. No. 124 at 5.) In addition, three impaired classes, Classes 5, 6, and 7, voted in favor of confirmation. (*Id.* at 3-4.)

treats their claims as unsecured.[15] (Doc. No. 73 ¶ 8; Doc. No. 74 ¶ 8.)

The Debtor disputes the assertion that the Plan was not filed in good faith and emphasizes that all other elements of § 1129(a) required for confirmation are easily met and that creditors fare better under the proposed reorganization than they would in a liquidation. In addition, the Debtor argues that because the Plan would be confirmed on a nonconsensual basis under § 1191(b), the Debtor retains the ability to modify the Plan following confirmation[16] if the Court determines the MCAs were sale transactions.

## II.    LAW AND ANALYSIS

Section 1129(a)(3) requires a Chapter 11 plan to be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). To demonstrate good faith, there must be "a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d

---

[15] For the first time in their objections to the Plan, the Funders dispute the value relied upon by the Debtor to argue the collateral is fully encumbered by FNB's lien. (Doc. No. 73 ¶ 9; Doc. No. 74 ¶ 9.) The Funders' valuation argument is untimely following the orders granting the Motions to Value approving the parties' stipulations. Although the orders preserved the parties' claims in the adversary proceedings, the Funders raised no claims concerning the valuation of the Debtor's assets under § 506(a). The time to dispute the scheduled value of the Debtor's assets in connection with the § 506(a) determination was when the issue was raised in the Motions to Value. That time passed and the orders are final.

[16] Section 1193(c) permits post-confirmation modification of nonconsensual plans:

> If a plan has been confirmed under section 1191(b) of this title, the debtor may modify the plan at any time within 3 years, or such longer time not to exceed 5 years, as fixed by the court, but may not modify the plan so that the plan as modified fails to meet the requirements of section 1191(b) of this title. The plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan, as modified, under section 1191(b) of this title.

Scant caselaw has emerged interpreting § 1193(c). *In re Samurai Martial Sports, Inc.*, 644 B.R. 667, 680 (Bankr. S.D. Tex. 2022). One bankruptcy court determined that modification under § 1193(c) requires that the modified plan be warranted under the circumstances and considers, as one element, whether unforeseen circumstances rendered the plan unworkable. *Id.* at 680-81.

1524, 1526 (11th Cir. 1995). "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirements of section 1129(a)(3) are satisfied." *Id.* "In assessing whether the plan was proposed in good faith, the Court considers the plan itself as well as the totality of circumstances surrounding the plan." *In re Aspen Vill. at Lost Mountain Assisted Living, LLC*, 609 B.R. 555, 569–70 (Bankr. N.D. Ga. 2019) (citing *Kaiser Aerospace & Elec. Corp. v. Teledyne Indus. (In re Piper Aircraft Corp.)*, 244 F.3d 1289, 1300 (11th Cir. 2001)). Courts make this assessment while "keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." *In re Star Tr.*, 237 B.R. 827, 834 (Bankr. M.D. Fla. 1999) (citing *McCormick*, 49 F.3d at 1526).

Here, the Funders maintain the Plan lacks good faith because it fails to account for the MCAs as true sales. They further argue the Debtor has been improperly using the receivables it sold them prepetition without first seeking a determination from this Court on whether the receivables are property of the estate. The Court begins by analyzing the Plan and the totality of circumstances surrounding it and will then analyze whether the Plan has a reasonable hope of success.

### A.  The Plan and totality of circumstances surrounding it are ordinary and do not reflect bad faith.

The circumstances surrounding the Plan, and the Debtor's filing of this Subchapter V case, are typical of Subchapter V cases filed in this district. To recap, the Debtor had a senior secured lender with a perfected lien against all the Debtor's assets, including the receivables generated by those assets. (Claim 4.) The Debtor experienced a shortage of cash and turned to the Funders for a solution. The Debtor received substantial sums of cash from the Funders shortly before filing this Subchapter V case and had not repaid the full amount owed by the

petition date.[17] The Funders timely filed proofs of claims asserting both an ownership interest and a security interest in the Debtor's future receivables.

The docket reflects inaction by the Funders for several months.[18] They did not object to the Debtor's use of cash, derived from the receivables they claim to own, to fund the Debtor's operations. The Funders were silent until the fifth month of the Debtor's case — six weeks after the Debtor filed its initial Subchapter V plan (Doc. No. 54) — when they filed their adversary proceedings seeking (among other counts) a determination that they owned the Debtor's future receivables, making this same argument weeks later when objecting to the Debtor's Motions to Value (Doc. Nos. 108, 109). In the orders granting the Motions to Value, the parties agreed to preserve their arguments on the ownership versus security interest issue for resolution in the pending adversary cases. (Doc. No. 122 ¶ 3; Doc. No. 128 ¶ 3.) However, the Funders also raise the ownership issue in their objections to confirmation, arguing the Plan lacks good faith for failing to account for their ownership of the Debtor's future receivables, and that property that was sold is not a debt that can be restructured. Because the adversary proceedings are still pending, they argue any determination regarding the parties' competing property interests in the future receivables prior to the conclusion of the adversary cases is premature.

Nothing about the foregoing circumstances leading up to confirmation is unusual, beyond perhaps the length of time the Funders waited before asserting their claims to own the Debtor's future receivables. But Subchapter V cases are designed to permit "small business debtors to

---

[17] In *The Murky Process of Characterizing Merchant Cash Advance Agreements*, Kara J. Bruce observes that "far from being the infusion of cash to right a sinking ship, these high-cost financing transactions often exacerbate an already perilous financial position… [p]redictably, some small businesses that have received MCA financing have quickly found their way to bankruptcy court." 42 No. 4 Bankruptcy Law Letter NL 1 (Apr. 2022).

[18] The Court's observation and conclusion regarding the Funders' inaction is, of course, limited to docket activity. The Court presumes (and hopes) the parties engaged in negotiations outside of its purview.

reorganize quickly, inexpensively, and efficiently[.]"[19] *In re Seven Stars on the Hudson Corp.*, 618 B.R. 333, 336 (Bankr. S.D. Fla. 2020). If the Debtor does not own its future receivables, the Debtor cannot reorganize using the income it derives from its post-petition services. The issue is outcome determinative on whether the Plan has a reasonable hope of success. As such, the decision cannot be postponed until the adversary proceedings, which assert other counts, are resolved. Therefore, the Court will determine the nature of the Funders' interests in the context of the Funders' objections to confirmation.[20] The question can be resolved by review of the MCAs attached to the Funders' proofs of claims[21] and by analyzing and applying the law.[22]

### B.  The Plan has a reasonable hope of success.

The Debtor's exhibits admitted during the confirmation hearing (Doc. No. 132) were adequate to demonstrate that if the Plan's proposed treatment of the Funders' claims, to the extent allowed, as Class 8 unsecured claims is merited, then the Plan has a reasonable hope of success. Thus, the Plan's success turns on the nature of the Funders' interests in the Debtor's

---

[19] For fiscal years 2020 through 2023, the median months to confirmation was 6.6. *United States Trustee Program, Chapter 11 Subchapter V Statistical Summary Through September 30, 2023, available at* https://www.justice.gov/ust/page/file/1499276/download (last visited Sept. 24, 2025). In fact, there are a handful of cases that reached confirmation even sooner, between one and three months after the petition date. *See, e.g.*, *In re: BPI SPORTS, LLC*, Case No. 23-17463-SMG (Bankr. S.D. Fla.) (plan confirmed in 32 days); *In re: Borden Improvement, LLC*, Case No. 6:21-bk-01694 (Bankr. M.D. Fla.) (plan confirmed in 71 days).

[20] This issue has been raised and decided by courts in different contexts. *See In re Watchmen Sec. LLC*, No. 24-00087-JMC-11, 2024 WL 4903363, at *1 (Bankr. S.D. Ind. Nov. 20, 2024) (determining issue on objections to claims); *In re Dryden Advisory Grp., LLC*, 534 B.R. 612, 619 (Bankr. M.D. Pa. 2015) (determining issue on motion to use cash collateral); *Lange v. Inova Cap. Funding, LLC (In re Qualia Clinical Serv., Inc.)*, Ch. 7 Case No. 09–80629–TJM, Adv. No. 09-8041-TJM, 2010 WL 1441495, (Bankr. D. Neb. April 6, 2010) (determining issue on cross motions for summary judgment), *aff'd* 441 B.R. 325, 329 (B.A.P. 8th Cir.), *aff'd*, 652 F.3d 933 (8th Cir. 2011).

[21] The parties executed the MCAs shortly before the petition date. Neither party alleged they deviated from the terms of the MCAs beyond the Funders' allegations that the Debtor failed to live up to its end of the bargain in short order and may have breached certain covenants.

[22] *But see Butler Trucking*, Ch. 11 Case No. 24-32443, Adv. No. 25-03004, 2025 WL 1934205, at *4 ("[T]he ultimate issue of whether the substance of the transaction was Plaintiff 'selling' unidentified future receipts to Defendant is a fact-intensive issue that cannot likely be resolved without the presentation of evidence at a hearing.").

post-petition receivables — whether the Funders own them or have a security interest in them. After analyzing the Funders' agreements and applicable law, the Court concludes they have neither.

1.   <u>The Funders do not own the Debtor's post-petition receivables.</u>

Quoting U.C.C. § 9-318(a), the Funders argue that "'[a] debtor that has sold an account, chattel paper, payment intangible, or promissory note ***does not retain a legal or equitable interest in the collateral sold***.'" (Doc. No. 73 ¶ 4; Doc. No. 74 ¶ 4 (emphasis in originals).) But one cannot sell more than one owns, and when the MCAs were executed prepetition, the Debtor had no future receivables to convey, only a hope they may come to exist. The Funders' position that the MCAs effectuated a sale of future receivables is contrary to the "fundamental legal principle that *nemo dat quod non habet* — nobody can give what he does not have." *Anderson Excavating, LLC v. Weiss World L.P.*, 638 F. Supp. 3d 525, 534 (W.D. Pa. 2022), *aff'd* No. 22-3278, 2023 WL 8519209 (3d Cir. Dec. 8, 2023); *see also JPMorgan Chase Bank, Nat'l Ass'n v. Argus Info. & Advisory Servs. Inc.*, 765 F. Supp. 3d 367, 377 (D. Del. 2025) ("a party cannot transfer rights that it does not have.").

The law "does not comprehend or countenance a present transfer of future property." John F. Hilsonal & Stephen L. Sepinuck, *A "Sale" of Future Receivables: Disguising a Secured Loan as a Purchase of Hope*, 9 Transactional Lawyer 14, 15 (2019). Rather, the law treats such

as a promise or as an agreement to sell, not as a present sale.[23]  *Id.* at 15 (a promise to transfer

property that the promisor hopes later to acquire may be enforceable as an executory contract to

sell). As summarized in *A "Sale" of Future Receivables*:

> A mere expectancy could never be the subject of a sale. "Thus, a
> man has no potential property in a catch of fish which he expects to
> make, even though he has a ship and nets and all the other appliances
> necessary for catching fish. He has no property, actual or potential,
> in any fish until they are actually caught, and hence cannot pass any
> property right in them until that time."

*Id.* at 18 n.12 (quoting Eugene Allen Gilmore & William Charles Wermuth, *Modern American*

*Law: A Systematic and Comprehensive Commentary on the Fundamental Principles of American*

*Law and Procedure, Accompanied by Leading Illustrative Cases and Legal Forms, with a Rev.*

*Ed. of Blackstone's Commentaries*, Vol. 4, January 1, 1914 (Blackstone Institute)).

Here, the Debtor had only an expectancy of future receivables, which cannot be the

subject of a sale. [24] The Debtor did not have any property rights to convey when entering the

---

[23] Another obstacle to interpreting MCAs as sale contracts arises because sales contracts generally have a short lifespan, while MCAs seek to exist indefinitely. This issue was identified in *In re Butler Trucking*:

> While most sales contracts have a short existence with limited responsibilities on both
> sides, the MCA Agreement continues to be an active transaction over a longer period of
> time, with important and ongoing responsibilities for each party that are set forth in the
> MCA Agreement. Thus, for example, if the "reconciliation provision" was not illusory, but
> was, in fact, an important and ongoing responsibility of Defendant, "Buyer" would have
> substantial continuing obligations under the MCA Agreement.

Ch. 11 Case No. 24-32443, Adv. No. 25-03004, 2025 WL 1934205, at *9 (citation omitted) (noting multiple other continuing obligations under the subject MCA Agreement).

[24] Unlike cases involving MCAs, this problem does not arise in a typical factoring relationship where a factor purchases the rights to *existing* payment streams. Factoring arrangements usually involve the purchase of rights to payment in which the debtor (seller) has already completed a sale of goods or performed services such that money is presently owed to the debtor, and the debtor sells or assigns the rights to payment to the factor (purchaser). By contrast, in typical MCA arrangements, the future receipts/receivables result from an anticipated sale of goods or future performance of services to potential future customers. The debtor lacks any vested property interest to convey because the rights to payment do not exist at the time of the MCA transaction.

MCAs as its interests in future receivables had not vested. U.C.C. § 9-318(a) does not alter this result because it presupposes the existence of a property right to convey. Specifically, U.C.C. § 9-318(a) references accounts, chattel paper, payment intangibles, and promissory notes, each a type of property the U.C.C. contemplates to exist in the present for the purposes of conveyance. To wit, U.C.C. § 9-102(a)(12) defines "collateral" to mean "the *property* subject to a security interest . . . [including] (A) proceeds to which a security interest attaches; (B) accounts, chattel paper, payment intangibles, and promissory notes that have been sold . . ." (emphasis added). A hope of future receivables is not property within the meaning of U.C.C. § 9-318(a) or U.C.C. § 9-102(a)(12).

Of the cases considering property interests in future receivables in the MCA context, the Court finds *In re Watchmen Security LLC*, No. 24-00087-JMC-11, 2024 WL 4903363 (Bankr. S.D. Ind. Nov. 20, 2024) to be the most persuasive, thorough, and factually similar. In *In re Watchmen Security LLC*, the Bankruptcy Court for the Southern District of Indiana analyzed a creditor's interests in post-petition accounts receivable arising from a prepetition MCA transaction where, like here, the debtor was a service business. *Id.* at *4-8. The MCA creditor argued that the MCA transaction was a sale of the debtor's future accounts receivable. *Id.* at *3. Like this Court, the court in *Watchman Security* was persuaded by the analysis in *A "Sale" of Future Receivables* that "'[a] transfer of future rights to payment—that is, rights that [do not yet] exist—cannot occur unless and until the rights to payment arise.'" *Id.* at *4 (quoting Hilsonal et al., *supra* Part B.1, at 15).  This Court agrees and concludes that a mere expectancy of future receivables dependent upon future services cannot be the subject of a completed sale transaction. Under the MCAs here, the Debtor lacked a vested property right to transfer on the MCA's

execution date.[25] The most the Debtor could do is promise to transfer any such receivables in the future.

The Funders' argument that U.C.C. § 9-318(a) strips the Debtor of any legal or equitable interest in its future receivables is further thwarted by 11 U.S.C. § 541(a)(7), which expressly includes in the estate "any interest in property that the estate acquires after commencement of the case." This plainly encompasses the receivables earned by the Debtor for post-petition services, which the prepetition Debtor lacked the authority to convey. 2024 WL 4903363, at *4. And, typically, estate property may not be sold absent authorization under the Code or by the Court.[26] Thus, the Court concludes U.C.C. § 9-318(a) does not divest the Debtor of any legal or equitable rights in its post-petition receivables.

> 2. <u>The Funders do not have a security interest in the Debtor's post-petition receivables.</u>

For many of the same reasons the Funders do not own the Debtor's post-petition receivables, the Funders also do not have a security interest in them because Article 9 "'does not

---

[25] *Compare Butler Trucking*, Ch. 11 Case No.: 24-32443, Adv. No. 25-03004, 2025 WL 1934205, at *8-9 (relying in part on the *nemo dat* maxim to find that the MCA transaction was not a completed sale transaction) *and In re Watchmen Security LLC*, No. 24-00087-JMC-11, 2024 WL 4903363, at *4-5 (same), *with Guttman v. EBF Holdings, LLC* (*In re Glob. Energy Servs., LLC)*, Ch. 7 Case No. 21-17305-NVA, Adv. No. 23-00188, 2025 WL 1012721 (Bankr. D. Md. 2025) (concluding, after analyzing funding agreement reconciliation provisions, term, recourse provisions, and evaluating transfer of risk, that agreement was a sale of future receipts; complaint failed to meet the plausibility requirement in alleging that the agreement was a loan).

[26] Sales of estate property in the ordinary course of a debtor's business do not generally require a hearing, while sales outside of the ordinary course do. *See* 11 U.S.C. § 363(b) (authorizing trustee to sell estate property after notice and hearing); 11 U.S.C. § 363(c) (authorizing trustee to sell estate property without notice and hearing if the transaction is in the ordinary course of business); *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 754 (9th Cir. 1985) (debtors are "authorized by 11 U.S.C. § 363 to sell things 'in the ordinary course of business,' but, otherwise, property of the estate may not be sold without notice or hearing."); *In re Atlanta Retail, Inc.*, 287 B.R. 849, 856 (Bankr. N.D. Ga. 2002) ("Section 363(c) of the Bankruptcy Code permits chapter 11 debtors to enter into transactions in the ordinary course of business without court approval; however, transactions outside of the ordinary course, must be authorized by the courts."); *Razorback Moving & Storage, Inc. v. Rice* (*In re Allison Warehouse & Transfer, Inc.)*, 145 B.R. 293, 295 (Bankr. E.D. Ark. 1992) (sale not final until bankruptcy court enters order approving it).

allow a party to create a security interest in property that does not yet exist.'"[27] *Id.* (quoting Hilsonal et al., *supra* Part B.1, at 15). "Under U.C.C. § 9-203(b)(2), a debtor must have '"rights in the collateral or the power to transfer rights in the collateral"' in order for a security interest (including the security interest of a purchaser of receivables) to attach." *Id.* (quoting Hilsonal et al., *supra* Part B.1, at 15). Again, the term "collateral" presupposes the existence of property and rights in that property. But here, the Debtor had no vested rights and no power to transfer its post-petition receivables when it entered the MCAs prepetition. The "replacement liens" in the interim cash collateral orders do not alter this result because "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a).

Of course, there is a significant exception supplied by U.C.C. § 9-315(a)(2) for identifiable proceeds of collateral, which come to exist after the disposition of original collateral. If the security interest was perfected in the original collateral, U.C.C. § 9-315(c) automatically perfects a security interest in the identifiable proceeds of that collateral; such interests are routinely protected and preserved as a lender's cash collateral, as they were in the orders approving the Debtor's use of cash during this case. But the Debtor's forward-looking hope for future receivables is not collateral to which a lien can attach because it is not "property" encompassed in the definition of "collateral" under U.C.C. § 9-102(a)(12).

In *In re Hamilton*, the Bankruptcy Court for the District of Colorado determined § 552(a) did not effectuate an unconstitutional taking of property from a lender, since it was impossible

---

[27] "In many respects, the distinction between sales of receivables and secured loans is of little import. Article 9 of the U.C.C. applies to both sales and security interests in receivables, minimizing the need to make distinctions in form." Bruce, *Murky Process*, *supra* note 17, at 3.

"to have a vested property right in after-acquired property . . . because, by definition, after-acquired property is a mere contingency." 18 B.R. 868, 870 (Bankr. D. Colo. 1982) (security interest did not apply to crops planted post-petition). As such, the most the creditor "could have acquired by [its] agreement with the Debtor was a vested interest, which, had the property ever come [to exist], would have become a vested property right." *Id.* But before the creditor's interest evolved into a property right, the debtor filed for bankruptcy and the creditor's interest was altered by § 552(a). *Id.*

Again, there are exceptions for creditors with a security agreement who can show a connection between prepetition property and the proceeds[28] of that property coming to exist post-petition. But here there is no connection; the Debtor performs in vitro fertilization services.[29] The Debtor's post-petition receivables are not proceeds of prepetition collateral. Accordingly, to the extent the Funders intended the MCAs to create a security agreement as a fallback position to a sale, § 552(a) precludes any lien from attaching to the Debtor's post-petition receivables.

3.  The Funders' MCAs.

Notwithstanding the Court's determination that, in the Debtor's case, the MCAs yielded neither an ownership interest nor a security interest in the Debtor's post-petition receivables as a matter of law, the Court will analyze the MCAs to determine whether they evidenced a loan or a sale transaction. When considering the "sale versus loan" issue, courts place the most emphasis on the transfer of risk — if the "buyer" is absolutely entitled to repayment under all

---

[28] "Proceeds" is defined in U.C.C. § 102(64)(A)-(C) to include "[w]hatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral"; "[w]hatever is collected on, or distributed on account of, collateral" and "[r]ights arising out of collateral." This definition is included in the definition of "proceeds" under Florida's U.C.C. Fla. Stat. § 679.1021(1)(ppp) (2025).

[29] As recognized in *A "Sale" of Future Receivables*, Hilsonal et al., *supra* Part B.1, at 18 n.53, "If the debtor is in a service industry, and therefore generates receivables from the provision of services rather than from the sale of inventory, it is unlikely that receivables generated post-petition will be proceeds of pre-petition collateral."

circumstances, then the risk remains with the "seller" and the transaction is considered a loan. *In re McKenzie Contracting, LLC*, No. 8:24-bk-01255-RCT, 2024 WL 3508375, at *2 (Bankr. M.D. Fla. July 19, 2024). Three primary factors guide the determination: whether the agreement contains: (i) a finite term, (ii) a reconciliation provision, and (iii) recourse provisions in the event of bankruptcy or a default. *Id.* The factors are only a guide and do not dictate the conclusion. *Id.*

      a.   Summary of Overton's "Standard Merchant Cash Agreement" with the Debtor.

Under Overton's "Standard Merchant Cash Agreement" (the "<u>Overton Agreement</u>"), which is governed by Florida law (Claim 7-1 Part 2 § 34), Overton purported to purchase $166,800 of the Debtor's future receipts in exchange for $120,000 in advance funding (*id.* Part 2 at 1). After deducting certain fees, Overton paid the Debtor $117,600. (*Id.*) In exchange, the Debtor was obligated to remit a "specified percentage" — 6% — of its future receivables, estimated at $3,971 per week (*id.*), by authorizing Overton to make electronic debits from an account (*id.* Part 2 § 1). This authorization was "irrevocable" absent Overton's written consent until the amount charged for the funding, $166,800, denoted as the "Receivables Purchased Amount" was paid in full or the Debtor went bankrupt or out of business. (*Id.* at 1, § 5.) The term of the Overton Agreement is "indefinite" and continues until Overton is paid in full, unless the agreement is terminated pursuant to any of its provisions, 44 out of 51 of which survive termination (*id.* Part 2 § 6), including Overton's right to proceed against the guarantor.

The Overton Agreement contains a reconciliation provision entitling both the Debtor and Overton to review amounts collected and owing to determine whether Overton collected more or less than it was entitled to and specifying that Overton may debit the Debtor's designated account (if less) or credit the Debtor's account (if more). (*Id.* Part 2 § 4.)

The Overton Agreement specifies that the transaction was intended as a sale of the Debtor's receivables and not a loan from Overton to the Debtor. (*Id.* Part 2 § 14.) In addition, it recites that Overton bears the risk that the Debtor's business may decline or fail, and that neither a bankruptcy case, business slowdown, or closure alone would be considered a breach. (*Id.* Part 2 § 14.)

Though characterized as a sale, the Overton Agreement also required the Debtor to grant Overton a security interest in "(a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the . . . UCC, now or hereafter owned or acquired . . . ; and (b) all proceeds, as that term is defined by Article 9 of the UCC." (*Id.* Part 2 § 29.) The Overton Agreement contained multiple representations and covenants whereby the Debtor confirmed it was not anticipating a bankruptcy filing and that the receivables purportedly sold under the Overton Agreement were owned by the Debtor and unencumbered by any lien other than any for which Overton may have actual, constructive, or inquiry notice. (*Id.* Part 2 §§ 25, 26.) It also contained an anti-stacking provision, wherein the Debtor represented it would not enter any sale or loan transaction with another party involving the same receivables covered by the Overton Agreement. (*Id.* Part 2 § 27.)

The Overton Agreement defined "Events of Default" to include, among other things, making intentionally false or materially misleading representations or warranties; preventing Overton's ACH debits absent prior written notice offering an alternative method to collect; or intentionally preventing Overton from collecting any part of the Receivables Purchased

Amount.[30] (*Id.* Part 2 § 30.) The Overton Agreement contained protections for Overton if a default occurred and outlined Overton's remedies. (*Id.* Part 2 §§ 16, 31.)

Upon default, unless waived by Overton, the Overton Agreement permitted Overton to accelerate payment of the "full uncollected Receivables Purchased Amount," and to enforce its security interests, among other things. (*Id.* Part 2 § 16.) The Overton Agreement also supplied Overton with an irrevocable power-of-attorney and the right to notify the Debtor's payment processors and account debtors that the Debtor sold its future receipts to Overton and to direct them to remit payments to Overton, without prior notice to the Debtor. (*Id.* Part 2 §§ 15, G1.) Furthermore, a default entitled Overton to proceed against Dr. Milton McNichol (*id.* Part 2 § 16), the Debtor's sole shareholder, president, and medical director, who guaranteed the Debtor's performance (*id.* Part 2 at 12). In addition, an addendum to Dr. McNichol's guarantee permits Overton to proceed against and restrain Dr. McNichol's accounts and receivables and deems Dr. McNichol to consent to any related injunction or restraining order without prior notice and without Overton furnishing a bond.[31] (*Id.* Part 2 § RG1 Remedies.)

> b. Analysis of the Overton Agreement.

The Overton Agreement does not contain a finite term, and the reconciliation provision appears to afford the Debtor and Overton the same rights. A meaningful reconciliation provision

---

[30] Bankruptcy is not listed as an event of default in the Overton Agreement. However, Region 21 of the U.S. Trustee Program, which includes Florida, requires a Chapter 11 debtor to "close its prepetition bank accounts and open new debtor-in-possession accounts and provide documentation of these actions to the United States Trustee." Region 21 Operating Guidelines & Reporting Requirements for Chapter 11 Debtors in Possession and Chapter 11 Trustees, at 3 (Oct. 2022), /www.justice.gov/ust/ust-regions-r21/file/ch11_guidelines_reporting_req.pdf/dl. Without a court order excusing the Debtor from opening debtor-in-possession accounts, a Chapter 11 bankruptcy filing would effectuate a block or stop of Overton's ACH debits, presumably triggering a default, absent Overton's waiver.

[31] This same provision is contained in another addendum to the Overton Agreement providing for additional remedies but pertains to the Debtor rather than Dr. McNichol. (Claim 7-1 Part 2 § R1 Remedies.)

and an indeterminate term tend to reflect a sale transaction. *Glob. Energy Servs.*, Ch. 7 Case No. 21-17305-NVA, Adv. No. 23-00188, 2025 WL 1012721 at *5-6. Nevertheless, the Overton Agreement easily qualifies as a loan transaction when evaluating the transfer of risk, and this factor carries the greatest weight.

Although the Overton Agreement recites that Overton bears the risk of non-payment, a deeper review of the agreement demonstrates otherwise. For example, the agreement styles Dr. McNichol's guaranty as a performance guaranty, but the performance Dr. McNichol guaranteed is that of payment; a default entitles Overton to seek an order enjoining or restraining Dr. McNichol's accounts without notice or posting a bond.[32] Characterizing what is clearly a payment guaranty as a performance guaranty is merely an effort to cloak the agreement in the guise of a sale. *Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*, No. 16-CV-2696 (ILG), 2017 WL 2912452, at *3 (E.D.N.Y. July 6, 2017) ("Although the Agreements do not contain an explicit guarantee of payment as such, it would be challenging to prescribe some other meaningful purpose the [personal guaranty of performance] was intended to serve."); *GWA, LLC v. Jefferies Strategic Invs., LLC (In re Weiss Multi-Strategy Advisers LLC)*, 664 B.R. 492, 531– 32 (Bankr. S.D.N.Y. 2024) ("[G]uarantees of performance can include guarantees of payments even when the language of the guarantee does not explicitly provide for such."); *see also Am. Trading Co. v. Fish*, 364 N.E.2d 1309, 1313 (N.Y. 1977) (finding that because the defendant guaranteed performance of the terms and conditions of the agreement, and those terms and conditions required payment by trade acceptances, "the guarantee must be interpreted as including payment according to and as provided in the agreement . . . ."). Overton's recourse to

---

[32] The Overton Agreement gives Overton the authority to waive a default if it so chooses. (*Id. Part* 2 § 30.) Overton's retention of discretion does not change the Court's analysis.

Dr. McNichol and the Debtor's other accounts reflect that Overton did not fully assume the risk of nonpayment. The Overton MCA therefore reflects a loan transaction and not a sale.

      c.   Summary of Fox's "Future Receivables Sale and Purchase Agreement" with the Debtor.

Shortly after entering into the Overton Agreement, on September 19, 2024, the Debtor executed the "Future Receivables Sale and Purchase Agreement" with Fox (the "<u>Fox Agreement</u>"). (Claim 8-1 Part 2 at ECF page 3.) Like the Overton Agreement, the Fox Agreement is governed by Florida law and expressly describes the transaction as a sale and not a loan. (*Id.* Part 2 at ECF page 3.)[33] The Fox Agreement contains multiple recitals to this effect.[34]

Under the Fox Agreement, Fox purported to purchase $92,300 of the Debtor's future receipts in exchange for $65,000 in advance funding. (*Id.* Part 2 at ECF page 3.) After deducting certain fees, the net funds paid to the Debtor totaled $63,700. (*Id.* Part 2 at ECF pages 3, 5.) The Debtor was obligated to remit a "Purchased Percentage" of 4.8% of its future receipts by

---

[33] Fox attached to its proof of claim the Commercial Financing Disclosure Form supplied to the Debtor as part of the MCA transaction, in which it refers to itself as the Provider. (Claim 8-1 Part 2.) In 2023, Florida enacted the Florida Commercial Financing Disclosure Law (the "FCFDL"). Fla. Stat. § 559.961, *et seq.* (2023). In the FCFDL, under the definition for "accounts receivable purchase transaction," the following provision is included: "*For purposes of this part*, the provider's characterization of an accounts receivable purchase transaction as a purchase is conclusive that the accounts receivable purchase transaction is not a loan or a transaction for the use, forbearance, or detention of money." Fla. Stat. § 559.9613(1) (2025) (emphasis added). Due to the prefatory language "For purposes of this part" the Court interprets the conclusive nature of a provider's characterization of an accounts receivables purchase transaction as a purchase to be limited in its application to Part XIII, the FCFDL, of Chapter 559, under Title XXXIII, of the Florida Statutes. The FCFDL "[r]equires certain disclosures by commercial financing transaction providers; [p]rohibits brokers from engaging in certain activities; and [g]rants the Attorney General exclusive authority to enforce Part XIII." Florida Staff Analysis, H.B. 1353, 2023 Regular Session (May 12, 2023). Only the Attorney General of Florida has the authority to enforce the FCFDL. Fla. Stat. § 559.9615(1) (2025). Thus, Fox's characterization of the transaction with the Debtor as a sale does not bind the Court.

[34] *See* Claim 8-1 Part 2 at ECF page 3 ("THIS IS NOT A LOAN. Merchant is selling a portion of a future revenue stream to [Fox] at a discount, not borrowing money from [Fox]."), § 1.9.1 ("Purchase Price is not intended to be, nor shall it be construed, as a loan from [Fox] to Merchant"), § 1.9.5 ("Merchant agrees that it will treat the Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns and not as a loan.").

allowing Fox to electronically debit $615.33 from a specified account each business day. (*Id.*

Part 2 at ECF page 3.) The debit authorization is irrevocable throughout the term of the

agreement, which expressly contained "no fixed duration or term, making the term potentially

infinite." (*Id.* Part 2 at ECF page 6.) The Fox Agreement purports to "expire" when the

"Purchased Amount and all other sums due to [Fox] are received by [Fox] in full" or, provided

the Debtor is not in default under the agreement, "the date of the total failure of [the Debtor's]

business and the complete cessation of all Receipts." (*Id.* Part 2 §1.1.)

 The Fox Agreement contains provisions permitting both the Debtor and Fox to request a

reconciliation, but the Debtor's ability to request a reconciliation is conditioned on the Debtor

not being in default. (*Id.* Part 2 § 1.5.1 ("As long as there has not been an Event of Default under

this Agreement, . . . Merchant shall have the right to request a reconciliation . . . .").) The Fox

Agreement defined "Events of Default" to include, among other things, any violation of a term

or covenant in the agreement. (*Id.* Part 2 § 3.1(1), (2).) Covenants include that the Debtor will

not, without written notice to Fox, intentionally interrupt its business operations or make any

material changes to the account designated for Fox's debits. (*Id.* Part 2 § 1.11.2). The Fox

Agreement also contains a solvency covenant (*id.* Part 2 § 2.10) and required the Debtor to

covenant that it did not contemplate filing a bankruptcy case in the next six months, had not

consulted with a bankruptcy attorney (*id.*), and that it had unencumbered, free and clear title to

all receipts, other than any for which Fox had actual or constructive notice (*id.* Part 2 § 2.11.).

 To secure the Debtor's performance of all covenants and obligations under the Fox

Agreement, the Debtor pledged a security interest and lien upon all its accounts and proceeds (*id.*

Part 2 §4.1) to permit Fox to collect the full Purchased Amount (*id.* Part 2 § 4.6). In addition, Dr.

McNichol provided a guaranty of the Fox Agreement. The guaranty is styled as a performance

guaranty and not an absolute payment guaranty. (*See id.* Part 2 at ECF page 3 ("Merchant and each Guarantor are guaranteeing performance of the terms of this Agreement and are not guaranteeing absolute payment of the Purchased Amount."), ¶ 1.9.2 ("This sale of Receipts is made without express or implied warranty to [Fox] of collectability of the Receipts and without recourse against Merchant, any Owner or any Guarantor if Receipts are not generated in the regular course of Merchant's business operations or cannot be collected, except as specifically set forth in this Agreement.").) Yet, the agreement required each owner and guarantor to authorize Fox to investigate "their financial responsibility and history, and [] provide to [Fox] any authorizations, bank or financial statements, tax returns and other financial records as [Fox] deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement through the Expiration Date." (*Id.* Part 2 ¶ 1.10.1.) In addition, the Guarantor was required to warrant and covenant that the financial statements of the Debtor and the Guarantor fairly represented their financial conditions, and had a "continuing, affirmative obligation to advise [Fox] of any material adverse change in their financial condition, operations, or ownership." (*Id.* Part 2 ¶ 2.1.) The Guarantor unconditionally guaranteed all the Debtor's obligations under the Fox Agreement. (*Id.* Part 2 ¶ 5.1.) And, "[f]or avoidance of doubt, this Guaranty is made for the purpose of securing performance of Merchant's obligations to [Fox]." (*Id.* Part 2 ¶ 5.1.)

A default under the Fox Agreement triggered acceleration of repayment. (*Id.* Part 2 at 4, 9 ¶ 3.3.) A default also triggered Fox's right to proceed against any Guarantor. (*Id.* Part 2 ¶ 3.2.) The Guarantor is obligated to pay Fox's attorney's fees and costs for any breach of covenant or default. (*Id.* Part 2 ¶ 3.4.) Finally, "in the event that Merchant or any Guarantor breach or threaten to breach any of the covenants, representations and warranties" in the agreement, they

consent to "ex parte . . . entry of a preliminary or permanent injunction, temporary restraining order, prejudgment attachment or other equitable relief . . . without the necessity of posting any bond or other security . . . ." (*Id.* Part 2 ¶ 3.5.)

> d.  Analysis of the Fox Agreement

The Fox Agreement is overly complicated and (possibly intentionally) confusing, making an analysis of the agreement challenging. The Court concludes the Fox Agreement does not contain a term, likely does not afford the Debtor an opportunity to request a reconciliation, and does not transfer the risk from the Debtor to Fox. Affording the most weight to the agreement's failure to transfer the risk to Fox as evidenced by Fox's recourse to Dr. McNichol, the Court determines the Fox Agreement reflects a loan transaction and not a sale.

The Fox Agreement states it has "no fixed duration or term, making the term potentially infinite." (*Id.* Part 2 at ECF page 6.) It provides it will simply "expire" when (i) Fox is fully paid, or (ii) the Debtor's business fails and ceases to collect receipts *provided the Debtor is not in default*. (*Id.* Part 2 §1.1 (emphasis added).) So, if Fox is not fully paid and the Debtor is in default, the agreement, as stated, is "potentially infinite." (*Id.* Part 2 at ECF page 6.) However, the agreement also specified a payment schedule, $615.33 each business day, from which a term might be calculated. Nevertheless, no term appears on the agreement's face.

There is a better than average chance the Debtor was in default of several covenants upon executing the Fox Agreement. The Debtor covenanted to solvency[35] and covenanted it had not consulted with a bankruptcy attorney yet filed this case three weeks after executing the agreement. The Debtor also covenanted to have unencumbered, free and clear title to all receipts, other than any liens for which Fox may have actual or constructive notice. Due to FNB's UCC-1

---

[35] Including a solvency covenant in an MCA agreement is ironic. *See* Bruce, *Murky Process*, *supra* note 17.

filing, Fox had actual notice of FNB's lien, but whether Fox had notice of Overton's prior claim to the Debtor's future receivables is uncertain.

The Debtor's default status is relevant not only because it impacts the term of the Fox Agreement, but also because the agreement does not permit the Debtor to request a reconciliation if the Debtor is in default of any of the agreement's covenants (*id.* Part 2 § 1.5.1), which it may well have been from the outset. If the Debtor was insolvent when it entered into the agreement despite covenanting otherwise, the Debtor would not have the right to request a reconciliation. Thus, the conditions to requesting a reconciliation appear likely to bar the Debtor from seeking that right.

Finally, regarding the Fox Agreement's recourse provisions, it is drafted to convey to the reader that Fox bears the risk. For example, the Fox Agreement expressly states that under certain circumstances, such as cessation of the Debtor's business, Fox "may never collect all or a substantial portion of the Purchased Amount." (*Id.* Part 2 §1.9.2; *see also id.* Part 2 ECF page 3 ("This sale of Receipts to [Fox] is made without recourse against Merchant or any Guarantors, except as specifically set forth in this Agreement."; "[Fox] is entering this Agreement knowing the risks that Merchant's business may slow down or fail.").) But these statements are belied by the recourse to Dr. McNichols who unconditionally guaranteed the Debtor's obligations. (*Id.* Part 2 ¶ 5.1.) If that is not clear enough, the agreement specified that, "[f]or avoidance of doubt, [Dr. McNichol's] Guaranty is made for the purpose of securing performance of [the Debtor's] obligations to [Fox]." (*Id.* Part 2 ¶ 5.1.) Thus, like the Overton Agreement, the Fox Agreement also does not evidence a sale transaction.

The Funders neither own nor have a security interest in the Debtor's post-petition receivables. The Plan and the totality of the circumstances surrounding it are ordinary and do not

reflect bad faith, and the Plan has a reasonable hope of success. Thus, the Funders' objections are overruled, and the Plan is confirmed.

### ###

The Clerk is directed to serve a copy of this opinion on all interested parties.